# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DANIEL M. BURKE,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:17cv00026 |
| | ) | **REPORT AND RECOMMENDATION** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | By:   PAMELA MEADE SARGENT |
| **Social Security,** | ) |      United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Daniel M. Burke, ("Burke"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Burke protectively filed his application for DIB on March 27, 2014, alleging disability as of January 1, 2014, based on diabetes; sciatica; high blood pressure; arthritis in his hands and neck; neuropathy; cataracts; problems with his shoulders; left hand and back pain; depression; and anxiety. (Record, ("R."), at 86, 271-72, 293, 311, 319.) The claim was denied initially and upon reconsideration. (R. at 181-83, 187-89, 192-95, 197-99.) Burke then requested a hearing before an administrative law judge, ("ALJ"). (R. at 200-01.) The ALJ held a hearing on November 15, 2016, at which Burke was represented by counsel. (R. at 104-52.)

By decision dated January 13, 2017, the ALJ denied Burke's claim. (R. at 86-98.) The ALJ found that Burke met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 88.) The ALJ found that Burke had not engaged in substantial gainful activity since January 1, 2014, the alleged onset date. (R. at 88.) The ALJ found that the medical evidence established that Burke had severe impairments, namely diabetes mellitus with neuropathy; degenerative disc disease of the cervical spine; degenerative joint disease of the knee; vision loss in the left eye; obesity; affective disorder; and anxiety disorder, but he found that Burke did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 88-89.) The ALJ found that Burke had the residual functional capacity to perform light[1] work that

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2018).

required no more than frequent feeling and fingering with the left upper extremity, kneeling and balancing; that required no more than occasional pushing, pulling and handling with the left upper extremity, crawling, crouching, stooping and climbing of ramps and stairs; that did not require climbing of ladders, ropes and scaffolds, exposure to extreme cold temperature, vibrations and hazards; and that did not require good depth perception or work at a production rate pace. (R. at 91.) The ALJ found that Burke was unable to perform his past relevant work. (R. at 96.) Based on Burke's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Burke could perform, including jobs as an usher, a tanning salon attendant and a rental consultant. (R. at 97-98.) Thus, the ALJ concluded that Burke was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 98.) *See* 20 C.F.R. § 404.1520(g) (2018).

After the ALJ issued his decision, Burke pursued his administrative appeals, (R. at 266-68), but the Appeals Council denied his request for review. (R. at 3-8.) Burke then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2018). This case is before this court on Burke's motion for summary judgment filed February 19, 2018, and the Commissioner's motion for summary judgment filed April 26, 2018.

*II. Facts*[2]

Burke was born in 1963, (R. at 111, 271), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Burke completed the eighth grade[3] and has past work experience as an automotive mechanic and a truck driver. (R. at 109, 112, 294, 343.)

Mark Hileman, a vocational expert, also was present and testified at Burke's hearing. (R. at 142-50.) Hileman was asked to consider a hypothetical individual of Burke's age, education and work history, who could perform light work that did not require more than occasional use of the left upper extremity for pushing, pulling or handling and frequent use of the left upper extremity for fingering and feeling; that did not require more than frequent kneeling and balancing; that did not require more than occasional crawling, crouching, stooping or climbing of ramps and stairs; that did not require climbing of ladders, ropes or scaffolds or work around cold temperature extremes, vibration, hazardous machinery and unprotected heights; and that did not require him to work at a production-rate pace. (R. at 143-44.) Hileman testified that such an individual could not perform Burke's past work, but could perform other work existing in significant numbers in the national economy, including jobs as an usher, a tanning salon attendant and a rental consultant. (R. at 145.)

---

[2] Burke's only dispute is with respect to the ALJ's assessment of his mental limitations. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Therefore, the court will address the facts relevant to Burke's mental health.

[3] Burke reported on his Disability Report that he completed the tenth grade, but school records indicate that he completed the eighth grade. (R. at 294, 343.)

Hileman next was asked to consider the same individual, but who could not perform work that required good depth perception. (R. at 145-46.) Hileman stated that the individual would be able to perform the jobs previously identified. (R. at 146.) He stated that there would be no skills from Burke's past work that would transfer to sedentary[4] work. (R. at 146.) Next, Hileman was asked to consider the same individual, but whose ability to handle, to finger and to feel would be less than occasional. (R. at 147.) He testified that such an individual could not perform any of the previously identified jobs. (R. at 147.) Hileman testified that there would be no jobs available should the individual have an unsatisfactory ability to maintain concentration and attention, to relate predictably in social situations and to demonstrate reliability. (R. at 148-49.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Rob Sawyer, O.D.; Appalachia Family Health; Dr. Jody B. Bentley, D.O.; Norton Community Hospital; Lonesome Pine Hospital; Mountain Empire Cataract & Eye Surgery Center; Paige Cordial, Psy.D., a licensed clinical psychologist; Dr. Donald Williams, M.D., a state agency physician; David Deaver, Ph.D., a state agency psychologist; and Dr. Luc Vinh, M.D., a state agency physician.

On February 11, 2013, Rebecca Mullins, F.N.P., a family nurse practitioner with Appalachia Family Health, saw Burke for complaints of panic attacks and a cough. (R. at 443.) Mullins reported that Burke had a normal gait; his neurological examination was normal, with the exception of diminished sensation in his right

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2018).

lower extremity; he had appropriate judgment and good insight; his remote and recent memory were intact; and he had a euthymic mood and appropriate affect. (R. at 444.) She diagnosed acute bronchitis and panic disorder without agoraphobia. (R. at 444.)

On September 30, 2014, Burke saw Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, ("C. Burke"), for complaints of uncontrollable crying spells. (R. at 537.) Burke also stated that he was very withdrawn. (R. at 537.) C. Burke diagnosed depressive disorder, not elsewhere classified; and anxiety state, unspecified. (R. at 538.)

On October 15, 2014, David Deaver, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Burke had moderate limitations in his activities of daily living; experienced no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 170-71.)

That same day, Deaver completed a mental assessment, indicating that Burke was moderately limited in his ability to respond appropriately to changes in the work setting. (R. at 175.) He found no limitations in Burke's memory, concentration or persistence. (R. at 175.) He also noted no additional limitations in Burke's ability to adapt. (R. at 175.)

On November 18, 2014, C. Burke completed a mental assessment, indicating that Burke had a slight limitation in his ability to maintain personal appearance. (R. at 457-59.) She found that Burke had a satisfactory ability to follow work rules; to use judgment; to understand, remember and carry out simple job instructions; to

relate predictably in social situations; and to demonstrate reliability. (R. at 457-58.) C. Burke opined that Burke was seriously limited in his ability to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; and to behave in an emotionally stable manner. (R. at 457-58.) She found that Burke had no useful ability to understand, remember and carry out complex job instructions. (R. at 457-58.) She found that Burke would be absent from work more than two days a month. (R. at 459.)

On December 16, 2014, C. Burke saw Burke for complaints of depression, anxiety, crying spells, panic attacks, irritability and being easily agitated. (R. at 532.) C. Burke reported that Burke's hygiene and grooming were appropriate; his mood was depressed with a congruent affect and thought; and he appeared anxious. (R. at 532.) C. Burke diagnosed panic disorder without agoraphobia; anxiety state, unspecified; and major depressive disorder, single episode, severe, without mention of psychotic behavior. (R. at 533.)

On February 9, 2015, Burke complained of anxiety, depression and agitation. (R. at 529.) C. Burke reported that Burke's hygiene and grooming were fair; his mood was depressed; he was tearful and fidgeted throughout the interview; he was anxious; and depression was noted in his thought content. (R. at 529.) C. Burke diagnosed depressive disorder, not elsewhere classified; and anxiety state, unspecified. (R. at 530.) On May 7, 2015, Burke reported that his panic attacks had improved, yet he reported that he still could not go to public places due to anxiety. (R. at 526.) C. Burke reported that Burke's hygiene and grooming were fair; he had a depressed mood; he was anxious; and he had depressed thought content. (R. at 526.) On June 19, 2015, Burke reported experiencing panic attacks. (R. at 523.) He

stated that he avoided participating in activities due to anxiety. (R. at 523.) Burke also reported that depression interfered with his activities of daily living. (R. at 523.) C. Burke reported that Burke had a depressed mood; anxious affect; adequate eye contact; and fair judgment and insight. (R. at 524-25.) C. Burke diagnosed depressive disorder, not elsewhere classified; and anxiety state, unspecified. (R. at 524.)

On July 1, 2015, C. Burke completed a mental assessment, indicating that Burke had a satisfactory ability to follow work rules; to understand, remember and carry out detailed and simple job instructions; to maintain personal appearance; and to demonstrate reliability. (R. at 516-18.) She found that Burke had a seriously limited ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 516-17.) C. Burke opined that Burke had no useful ability to deal with work stresses. (R. at 516.) She found that Burke would be absent from work more than two days a month. (R. at 518.)

On July 22, 2015, Burke reported increased anxiety and panic attacks, depression and socially withdrawal. (R. at 520.) C. Burke reported that Burke had a depressed mood; anxious affect; adequate eye contact; fair judgment and insight; and distractible thought process. (R. at 521.) C. Burke diagnosed depressive disorder, not elsewhere classified; and anxiety state, unspecified. (R. at 521.)

On July 29, 2015, Ava Martin, PMHNP-BC, a board certified Advanced Practice Psychiatric Mental Health Nurse Practitioner with Appalachia Family Health, noted that Burke was cooperative; he had a mildly depressed mood;

anxious affect; made minimal eye contact; had intact thought process; and had fair judgment and insight. (R. at 542-43.) Martin diagnosed depressive disorder, not elsewhere classified; anxiety state; and insomnia. (R. at 542.)

On August 19, 2015, C. Burke completed a mental assessment, indicating that Burke had a slight limitation in his ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 545-47.) She found that Burke had a satisfactory ability to follow work rules; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 545-46.) C. Burke found that Burke had a seriously limited ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; and to understand, remember and carry out complex job instructions. (R. at 545-46.) She found that Burke would be absent from work more than two days a month. (R. at 547.)

On August 26, 2015, Burke reported that his medication was helping improve his mood, and his panic attacks and crying spells had decreased. (R. at 671.) C. Burke noted improvements with Burke's symptoms of depression. (R. at 672.) She reported that Burke had a depressed mood; congruent affect; adequate eye contact; intact thought process; and fair judgment and insight. (R. at 672-73.) On September 23, 2015, Burke reported that his panic was manageable; he was happier; and he looked forward to doing things. (R. at 731.) Martin reported that Burke had a euthymic mood; congruent affect; minimal eye contact; intact thought process; fair judgment and insight; and his recent and remote memories were intact. (R. at 731.) On October 12, 2015, Burke reported that medication was improving his symptoms of anxiety and depression. (R. at 668.) He stated that his

panic attacks had decreased, and he was less withdrawn. (R. at 668.) C. Burke reported that Burke was mildly anxious; had adequate eye contact; had intact thought process; and fair judgment and insight. (R. at 669.)

On November 4, 2015, Burke reported that he was "doing pretty good." (R. at 727.) He stated that his panic was more manageable. (R. at 727.) Martin reported that Burke had a euthymic mood; congruent affect; appropriate eye contact; intact thought process; fair judgment and insight; and his recent and remote memories were intact. (R. at 727-28.) On November 16, 2015, despite reporting worsening anxiety and depression due to the change of the season, the upcoming holidays and extra expenses, Burke stated that he believed that his medication was working. (R. at 665.) C. Burke reported that Burke had a depressed mood; sad affect; adequate eye contact; intact thought process; fair judgment and insight; and passive thoughts of suicide. (R. at 666-67.) On December 2, 2015, Martin reported that Burke was mildly depressed; he had a congruent affect; appropriate eye contact; intact thought process; fair judgment and insight; he was calm and cooperative; he had good articulation; and he had average intellect. (R. at 723-24.) On December 7, 2015, Burke reported that anxiety and depression were interfering with his activities of daily living. (R. at 661.) C. Burke reported that Burke had a depressed mood; anxious affect; adequate eye contact; fair judgment and insight; and intact thought process. (R. at 663.)

On January 6, 2016, Burke reported increased panic attacks. (R. at 716.) Martin reported that Burke was mildly depressed; mildly anxious; he made appropriate eye contact; had intact thought process; had fair judgment and insight; was calm and cooperative; had good articulation and average intellect; and his

recent and remote memories were intact.[5] (R. at 718-19.) On January 27, 2016, Burke reported irritability, difficulty concentrating, anxiety and panic. (R. at 657.) C. Burke reported that Burke had a depressed mood; anxious affect; adequate eye contact; and fair judgment and insight. (R. at 659.) C. Burke diagnosed major depressive disorder, single episode, unspecified; panic disorder without agoraphobia; and anxiety disorder, unspecified. (R. at 658.)

On February 3, 2016, Burke reported that he was "doing better." (R. at 712.) He stated that trazodone helped him sleep. (R. at 712.) Martin reported that Burke was mildly depressed; mildly anxious; made appropriate eye contact; had intact thought process; had fair judgment and insight; was calm and cooperative; had good articulation and average intellect; and his recent and remote memory were intact. (R. at 712-13.) On March 2, 2016, Burke reported that he was sleeping better and feeling better. (R. at 705.) Martin reported that Burke had a euthymic mood; congruent affect; appropriate eye contact; intact thought process; fair judgment and insight; unremarkable motor movements; recent and remote memories were intact; good articulation; and average intellect.[6] (R. at 707-08.) On March 16, 2016, Burke reported experiencing "nervous episodes" due to family stressors. (R. at 653.) C. Burke reported that Burke's mood and affect were anxious; he had adequate eye contact; and fair judgment and insight. (R. at 655.) C. Burke diagnosed major depressive disorder, single episode, unspecified; panic disorder without agoraphobia; anxiety disorder, unspecified; and insomnia. (R. at 654.)

---

[5] Martin made the same observation on June 22, 2016; July 20, 2016; and September 6, 2016. (R. at 682-83, 687-88, 692-93.)

[6] Martin made the same observation on March 30, 2016; November 1, 2016; December 13, 2016; and January 17, 2017, with the exception of Burke being noted to have a mildly depressed mood on December 13, 2016. (R. at 68-69, 75-76, 80-81, 702-03.)

On April 27, 2016, Burke reported that he was "doing ok." (R. at 697.) Martin reported that Burke had a euthymic mood; congruent affect; appropriate eye contact; intact thought process; fair judgment and insight; unremarkable motor movements; good articulation; and average intellect. (R. at 698.) Martin diagnosed major depressive disorder, single episode, unspecified; panic disorder without agoraphobia; anxiety disorder, unspecified; and insomnia. (R. at 697.) On May 5, 2016, Burke reported that medication was helping his symptoms of anxiety and panic attacks. (R. at 650.) C. Burke reported that Burke had a mildly anxious mood; congruent affect; adequate eye contact; intact thought process; and good judgment and insight. (R. at 652.) On June 14, 2016, Burke reported that family stressors caused an increase in panic attacks. (R. at 646.) C. Burke reported that Burke had a depressed mood; anxious affect; scattered thought process; and fair judgment and insight. (R. at 648.) On August 24, 2016, Burke reported that his mother recently passed away. (R. at 642.) As a result, he stated that he had panic attacks, trouble sleeping and increased anxiety and depression. (R. at 642.) C. Burke diagnosed major depressive disorder, single episode, unspecified; panic disorder without agoraphobia; anxiety disorder; and bereavement. (R. at 643.) C. Burke reported that Burke had a depressed mood; sad affect; scattered thought process; and fair judgment and insight. (R. at 644.)

On September 14, 2016, C. Burke completed a mental assessment, indicating that Burke had a slight limitation in his ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 751-53.) She found that Burke had a satisfactory ability to follow work rules; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 751-52.) C. Burke found that Burke had a seriously limited ability to relate to co-workers; to deal with the public; to use judgment; to

interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. (R. at 751-52.) She found that Burke would be absent from work more than two days a month. (R. at 753.)

On September 26, 2016, C. Burke reported that Burke was grieving the loss of two significant family members. (R. at 768.) C. Burke reported that Burke's mood was depressed; he had an anxious affect; adequate eye contact; fair judgment and insight; and intact thought process. (R. at 770.)  On October 4, 2016, Burke reported that he was feeling better. (R. at 778.)

On October 25, 2016, Paige Cordial, Psy.D., a licensed clinical psychologist, evaluated Burke at the request of Burke's attorney. (R. at 784-91.) Cordial noted that Burke was well groomed; he had adequate concentration; he did not appear overtly anxious; he appeared depressed and tearful at times; and he displayed no significant problems with memory or psychotic symptoms. (R. at 784.) Burke stated that he and his wife cared for two foster children, but that his wife did most of the care due to his health. (R. at 785.) The Kaufman Brief Intelligence Test, Second Edition, ("K-BIT II"), was administered, and Burke obtained a verbal IQ score of 83, a non-verbal IQ score of 63 and an IQ composite score of 72. (R. at 787-88.) It was noted that the IQ composite score was not considered a good estimate of Burke's overall ability level due to his verbal abilities appearing to be better developed than his non-verbal problem solving abilities. (R. at 788.) The Beck Depression Inventory, Second Edition, ("BDI-II"), indicated that Burke suffered from severe depression. (R. at 788.) The Burns Anxiety Inventory, ("BAI"), indicated that Burke suffered from extreme anxiety symptoms. (R. at 788.) The Wide Range Achievement Test, Fourth Edition, ("WRAT-IV"), indicated that Burke's academic abilities ranged from the third-grade level to the

ninth-grade level, and that he struggled most with spelling. (R. at 788.) Cordial
diagnosed major depressive disorder, recurrent, moderate; generalized anxiety
disorder; panic disorder; borderline intellectual functioning; and specific learning
disorder in written expression with impairment in spelling accuracy. (R. at 791.)

On October 31, 2016, Burke reported anxiety and fatigue. (R. at 763.) C.
Burke reported that Burke had an anxious mood and affect; adequate eye contact;
intact thought process; and fair judgment and insight. (R. at 766.) On November 1,
2016, Burke reported that he was feeling better. (R. at 773.)

On November 11, 2016, Cordial completed a mental assessment, indicating
that Burke had a slight limitation in his ability to follow work rules; to function
independently; and to maintain personal appearance. (R. at 793-95.) She found that
Burke had a satisfactory ability to relate to co-workers; to use judgment; to interact
with supervisors; to maintain attention and concentration; to understand, remember
and carry out simple job instructions; and to behave in an emotionally stable
manner. (R. at 793-94.) Cordial found that Burke had a seriously limited ability to
deal with the public; to deal with work stresses; to understand, remember and carry
out detailed and complex job instructions; to relate predictably in social situations;
and to demonstrate reliability. (R. at 793-94.) She found that Burke would be
absent from work more than two days a month. (R. at 795.)

On January 4, 2017, Burke reported depression resulting from grief,
financial stressors and chronic pain. (R. at 28.) C. Burke reported that Burke had a
depressed mood; sad affect; adequate eye contact; intact thought process; and fair
judgment and insight. (R. at 30.) On January 17, 2017, Burke reported that he was
feeling "good." (R. at 66.) On February 6, 2017, Burke complained of depression
and anxiety attacks. (R. at 22.) C. Burke reported that Burke had a depressed

mood; a sad and tearful affect; adequate eye contact; intact thought process; and fair judgment and insight. (R. at 24.) C. Burke diagnosed major depressive disorder, single episode, unspecified; panic disorder without agoraphobia; and anxiety disorder, unspecified. (R. at 24.)

On February 16, 2017, C. Burke completed a mental assessment, indicating that Burke had a slight limitation in his ability to maintain personal appearance. (R. at 62-64.) She found that Burke had a satisfactory ability to follow work rules; to relate to co-workers; to interact with supervisors; to function independently; to understand, remember and carry out detailed and simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 62-63.) C. Burke opined that Burke was seriously limited in his ability to deal with the public; to use judgment; to deal with work stresses; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. (R. at 62-63.) She found that Burke would be absent from work more than two days a month. (R. at 64.)

On March 8, 2017, Burke reported numerous stressors with his home being in foreclosure. (R. at 16.) Burke stated that he had been spending time with his grandson, which improved his mood. (R. at 16.) C. Burke reported that Burke had a depressed mood; a sad and tearful affect; appropriate eye contact; intact thought process; and fair judgment and insight. (R. at 19.) C. Burke diagnosed major depressive disorder, single episode, unspecified; panic disorder without agoraphobia; anxiety disorder, unspecified; and insomnia, unspecified. (R. at 18.) On April 6, 2017, Burke reported depression, anxiety, poor coping skills and other health issues. (R. at 10.) C. Burke reported that Burke had an anxious mood and affect; he was fidgeting and restless; he had appropriate eye contact; intact thought process; and fair judgment and insight. (R. at 13.) She continued to diagnose major

depressive disorder, single episode, unspecified; panic disorder without agoraphobia; and anxiety disorder, unspecified. (R. at 12.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & 2018 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Burke argues that the ALJ erred by improperly determining his mental residual functional capacity by rejecting the opinions of counselor C. Burke and psychological examiner Cordial. (Plaintiff's Brief at 5-6.) The ALJ found Burke suffered from a severe affective disorder and a severe anxiety disorder. (R. at 88.) A severe impairment significantly limits a claimant's ability to do basic work activity. *See* 20 C.F.R. § 404.1522(a) (2018). Based on Burke's mental impairments, the ALJ found that Burke had the residual functional capacity to perform light work that did not require work at a production rate pace. (R. at 91.) Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's finding with regard to Burke's mental residual functional capacity.

The ALJ noted that he was rejecting C. Burke's assessments because they were not supported by any significant narrative explanation or by the objective medical evidence of record, including C. Burke's own treatment notes. (R. at 95-96.) In addition, the ALJ noted that he was giving Cordial's assessment "little weight" because it was not supported by the objective mental health records. (R. at 96.) Both C. Burke and Cordial found that Burke was seriously limited in his ability to deal with the public; to deal with work stresses; to understand, remember and carry out complex job instructions and to relate predictably in social situations.

(R. at 62-63, 457-58, 516-17, 545-46, 751-52, 793-94.) Burke reported that he was prone to extreme displays of anger, including damage to property and threats to assault others. (R. at 790.) The ALJ noted that Burke was moderately limited in his ability to adapt, which included his ability to regulate emotions; to control behaviors; to maintain well being in a work setting; to respond to demands; to adapt to changes; to manage psychologically based symptoms; to distinguish between acceptable and non-acceptable work performance; and to set realistic goals. (R. at 91.) The ALJ also noted that Burke was limited to work in an environment with fairly low stress, as determined by the state agency psychologist. (R. at 96.) Nonetheless, while the ALJ noted these limitations in his decision, he failed to address these limitations in his mental residual functional findings. (R. at 91.)

In addition, the record shows that Burke has a limited education. (R. at 343-48.) Burke has been diagnosed with a specific learning disorder and borderline intellectual functioning. (R. at 791.) C. Burke and Cordial opined that Burke was seriously limited in his ability to understand, remember and carry out detailed instructions. (R. at 458, 794.) While the ALJ mentioned Burke's diagnosis of borderline intellectual functioning, he failed to discuss what weight, if any, he was giving the diagnosis other than to say that he was giving Cordial's opinion little weight because her opinion was based on Burke's subjective complaints rather than objective education, medical and mental records. (R. at 96.) To the contrary, Cordial administered the K-BIT II, and Burke obtained a verbal IQ score of 83, a non-verbal IQ score of 63 and an IQ composite score of 72. (R. at 787-88.) Cordial noted that the IQ composite score was not considered a good estimate of Burke's overall ability level due to his verbal abilities appearing to be better developed than this non-verbal problem solving abilities. (R. at 788.)

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight she has given to obviously probative exhibits, to say that her decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Based on this, I do not find that substantial evidence exists in the record to support the ALJ's weighing of the medical evidence or his finding with regard to Burke's mental residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence does not exist in the record to support the ALJ's finding with regard to Burke's mental residual functional capacity; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that Burke was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Burke's motion for summary judgment; deny the Commissioner's motion for summary judgment; vacate the Commissioner's decision denying benefits; and remand the case to the Commissioner for further consideration.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed

findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

DATED:     March 20, 2019.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE